# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN AND JANE DOES D-1, E-1 through E-14, F-1, G-1 through G-4, H-1 through H-3, I-1 through I-9, J-1 through J-6, K-1 through K-8, L-1 through L-2, M-1 through M-2, N-1 through N-3, O-1, P-1 through P-4, Q-1 through Q-3, R-1, S-1 through S-3, T-1 through T-5, U-1 through U-3, V-1 through V-5, W-1 through W-4, X-1, Y-1 through Y-2, Z-1 through Z-4, AA-1 through AA-7, BB-1 through BB-2, CC-1 through CC-6, DD-1, EE-1 through EE-2, AND FF-1 through FF-9,<br><br>      Plaintiffs,<br>  v.<br><br>DEMOCRATIC PEOPLE'S REPUBLIC OF KOREA Ministry of Foreign Affairs Jungsong-Dong, Central District, Pyongyang, Democratic People's Republic of Korea,<br><br>      Defendant. | CASE NO. 1:23-cv-00273 |

## COMPLAINT FOR DAMAGES FOR STATE-SPONSORED TERRORISM UNDER THE FOREIGN SOVEREIGN IMMUNITIES ACT

### INTRODUCTION

1. Plaintiffs bring this action against the Democratic People's Republic of Korea ("DPRK" or "North Korea" ) pursuant to the "Terrorism Exception" of the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. § 1605A for North Korea's attack on the U.S.S. Pueblo ("Pueblo") and its 83-member crew on January 23, 1968 and for North Korea's subsequent kidnapping and torture of the crew for eleven months. This case arises out of the same core facts as those in two prior cases in which this Court held Defendant liable for such acts and awarded

1

damages for the resulting injuries sustained by members of the crew and their eligible family members. *See Doe v. Democratic People's Republic of Korea*, 414 F. Supp. 3d 109 (D.D.C. 2019) (Friedrich, J.) (granting motion for partial default judgment and holding North Korea liable to 61 crew members and 110 family members); *Doe v. Democratic People's Republic of Korea*, No. 18-CV-0252, 2021 WL 723257 (D.D.C. Feb. 24, 2021) (Friedrich, J.) ("*Pueblo I*") (awarding damages to all plaintiffs); *Massie et al. v. Gov't of the Democratic People's Republic of Korea*, 592 F. Supp. 2d 57, 75-76, 77 (D.D.C. 2008) (Kennedy, Jr. J.) (holding North Korea liable under predecessor FSIA terrorism exception, 28 U.S.C. § 1605(a)(7), and awarding damages to four Pueblo crew members and one family member).

2. North Korea, acting through its officials, employees, service members, and/or agents, caused the death of one crewman during the attack, wounded 10 others, and hijacked the vessel. It then kidnapped the surviving 82 crew members ("Crew Members"), held them hostage for the next 334 days in horrible and inhumane conditions, and subjected them to repeated physical and mental torture until their release on December 23, 1968. As a result, North Korea also injured the family members of the crew.

3. The U.S. State Department designated North Korea a state sponsor of terrorism most recently on November 30, 2017, in part because of North Korea's actions giving rise to this case. The FSIA's Terrorism Exception affords certain victims of state-sponsored terrorism a private right of action against a designated state sponsor of terrorism whose officials, employees, service members, and/or agents have engaged in, or provided material support for, *inter alia*, extrajudicial killing, hostage taking, and acts of torture.

4. Plaintiffs include living Crew Members and estates of deceased Crew Members who were serving aboard the Pueblo when North Korea attacked the vessel in international waters while on a surveillance mission for the U.S. Government (collectively "Crew Member Plaintiffs"). None of them was a plaintiff in *Massie* or *Pueblo I*. The Crew Member Plaintiffs seek compensatory damages for Defendant taking them hostage and torturing them, and thereby causing them severe and lasting physical injuries, disfigurement, psychological harm, and extreme mental anguish.

5. Plaintiffs also include persons and estates of deceased persons who in 1968 were immediate family of a Crew Member and who suffered extreme mental anguish as result of Defendant's hostage taking and torture of their Crew Member ("Family Member Plaintiffs"). None of them was a plaintiff in *Massie* or *Pueblo I*. The Family Member Plaintiffs seek compensatory damages for their loss of solatium and the lasting emotional distress caused by North Korea.

6. Plaintiffs assert claims under federal law for hostage taking and torture, and under state common law theories of liability for assault and battery, false imprisonment, intentional infliction of emotional distress, and loss of solatium.

**PARTIES**

7. Each of the 15 living and estate Crew Member Plaintiffs identified in Group 1 in Appendix A to Plaintiffs' *Ex Parte* Motion to Proceed with Their Civil Action Using Pseudonyms and to Seal Personally Identifying Information (hereinafter, "Appendix A") was, at the time of the attack, a member of the armed forces, as those terms are used in FSIA §§ 1605A(a)(2)(A)(ii)(II) and 1605A(c)(2).

8. Each of the 47 living Family Member Plaintiffs identified in Group 2 of Appendix A is a national of the United States as that term is used in §§ 1605A(a)(2)(A)(ii)(I) and § 1605A(c)(1).

9. Each of the 51 estate Family Member Plaintiffs identified in Group 3 of Appendix A was, at the time of their death, a national of the United States as that term as used in FSIA §§ 1605A(a)(2)(A)(ii)(I) and FSIA § 1605A(c)(1).

10. Each of the 3 Family Member Plaintiffs identified in Group 4 of Appendix A is or, at the time of their death, was a foreign national and an immediate relative of a Pueblo Crew Member who was a member of the armed forces.

11. Defendant North Korea is a foreign state as that term is defined in FSIA §1603(a) and as it is used in §§ 1330(a) and 1605A. As of the date of filing this action, it is a state sponsor of terrorism within the meaning of FSIA §1605A(a)(2)(A)(i) and was so designated by the U.S. Department of State in part because of its actions that give rise to this case.[1]

---

[1] North Korea was first designated a State Sponsor of Terrorism on February 5, 1988. Notice, Determination Pursuant to § 6(i) of the Export Administration Act of 1979; North Korea, 53 Fed. Reg. 3477-01 (Feb. 5, 1988). That designation was due in part to North Korea's actions on which Plaintiffs base their claims. *See Massie v. Gov't of the Democratic People's Republic of Korea*, 592 F. Supp. 2d 57, 74 (D.D.C. 2008) (concluding that North Korea's designation as a State Sponsor of Terrorism was in part based on its acts herein complained). North Korea was de-designated as a State Sponsor of Terrorism on October 11, 2008, pursuant to an agreement with the United States (that later failed) in which North Korea undertook to decommission its reactor and reprocessing facilities that produced plutonium for nuclear weapons. *See* Mark E. Manyin, Emma Chanlett-Avery, Dianne Rennack, Ian Rinehart & John Rollins, Cong. Rep. No. R43865, *North Korea: Back on the State Sponsors of Terrorism Lists?* at 4 (2015). North Korea remained off of the list of State Sponsors of Terrorism until it was re-designated as such on November 20, 2017. *See* U.S. Dep't of State, "State Sponsors of Terrorism," available at https://www.state.gov/j/ct/list/c14151.htm (last accessed January 24, 2023).

**JURISDICTION AND VENUE**

12. This Court has subject matter jurisdiction over this action pursuant to the FSIA's Terrorism Exception, 28 U.S.C. § 1605A(a)(1) & (2),which provides that

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking [and]

> "[t]he court shall hear a claim under this section if . . . the foreign state was designated as a state sponsor of terrorism at the time the act . . . occurred, or was so designated as a result of such act, and . . . either remains so designated when the claim is filed under this section or was so designated within the 6-month period before the claim is filed under this section . . . .

13. The Terrorism Exception provides subject matter jurisdiction to hear claims against North Korea by Pueblo crew members and their immediate family members because North Korea is currently designated as a state sponsor of terrorism, and it was re-designated as such in 2017 as a consequence of holding the Pueblo crew hostage and torturing them.[2]

14. Pursuant to 28 U.S.C. § 1330(b), this Court will have personal jurisdiction over North Korea, once service of process is completed in accordance with FSIA § 1608(a).[3]

15. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(f)(4) which provides, in pertinent part, that a civil action against a foreign state may be brought in the United States District Court for the District of Columbia.

---

[2] *See Doe v. Democratic People's Republic of Korea*, 414 F. Supp. 3d at 124 & n. 6.

[3] Plaintiffs will include in the documents to be served on North Korea an offer to arbitrate, as required by FSIA §1605A(a)(A)(iii).

## FACTS

*North Korea Attacked the Pueblo and Its Crew*

16.     On January 23, 1968, the Pueblo was patrolling international waters off the Korean peninsula with its 83-member crew. The crew included U.S. Navy personnel and several civilians. As a surveillance vessel, the Pueblo lacked armored protection and had only limited arms onboard to support its defense against an attack.

17.     Over the course of several hours that harrowing afternoon, North Korea's military forces approached the Pueblo, eventually surrounding it with heavily-armed torpedo boats, attack ships, and fighter planes. North Korea's forces threatened the Pueblo: comply with North Korea's requests to heave to or else they would open fire.

18.     The Pueblo tried to leave the area and avoid confrontation, but North Korea blocked its exit. North Korean torpedo boats threatened the Pueblo with a torpedo attack and eventually opened fire on it multiple times, raking the ship with machine gunfire and pumping 57mm shells into its forward masts, knocking out its antennas and sending shrapnel spraying across the deck.

19.     One of the rounds North Korea fired while attacking the vessel killed Pueblo Fireman Duane Hodges. Numerous Crew Members witnessed crewman Hodges be shot and killed.

20.     Armed North Korean forces eventually boarded the Pueblo, ordering and then forcing the Crew Members to sit on the freezing deck, blindfolded and bound. North Korea's forces beat any Crew Member who failed to comply immediately.

*North Korea Took the Pueblo's Crew as Hostages*

21. After the initial attack, the Crew Members were forcibly removed to the mainland. Armed North Korean soldiers led the blind-folded and bound Crew Members off the Pueblo through a crowd of North Korean civilians that spat, hit, and cursed them. Crew Members were then led to and forced to board buses that transferred them to a train station where they awaited a train to transport them to Pyongyang. During their transport, North Korea's forces beat some Crew Members while demanding confessions that they were U.S. spies. The Crew Members were not permitted to speak to each other under penalty of additional beating.

22. Over the course of the next eleven months, North Korea held the surviving Crew Members hostage in depraved and unsanitary conditions in two detention centers in North Korea. The hostages were detained in Pyongyang for approximately six weeks at the first detention center, which the Crew Members called the "Barn." The Crew Members were detained at the second detention center, on the outskirts of Pyongyang, dubbed the "Farm," until they were released on December 23, 1968.

*North Korea Tortured the Pueblo's Crew at the Barn*

23. When the Crew Members arrived at the Barn, armed North Korean military personnel and other guards continually tortured the Crew Members by kicking them with hard combat boots, beating them with riffle and bayonet butts, and causing them to perform exercises that caused severe and extreme pain. The forced exercises resulted in deformation and long-term physical suffering for some Crew Members.

24. To coerce confessions that the United States was spying on North Korea, in sessions lasting from several hours to several days and occurring repeatedly during their first six

weeks as hostages, Crew Members were forced to kneel on the floor and hold a chair above their heads indefinitely until their torturers were satisfied they had extracted a confession from them. If the Crew Member began to struggle with holding the chair up, the torturers would close in and begin kicking and beating them all over their bodies.  When the pain of the kicking and beating became unbearable, the Crew Members forced themselves to raise the chair once more, only to drop it again a short time later and subject themselves to further beatings.

25. Further, North Korean guards stripped certain Crew Members down to their underwear and placed a 2x2 lumber plank behind their knees as they knelt on the floor, cutting off circulation in their legs. Guards then made those men walk on their knees in circles on the warped, uneven floorboards, while their knees bled from the friction.  Once the Crew Members stopped, the guards beat them continuously to obtain signed confessions. For most, a confession never happened, so they were subjected to torture until the armed guards decided to give up for the day.

26. On numerous occasions, the torturers also beat Crew Members to coerce them into compliance with North Korea's orders and demands, or for no reason at all except that beating American military was a sport to them.

27. North Korea also threatened Crew Members with further severe pain and suffering, including threats of death and/or additional torture of other Crew Members, for failure to comply with its orders and demands.

***North Korea Continued Its Torture of The Pueblo's Crew at the Farm***

28. At the Farm, the torture and beatings continued, often to the point of the Crew Members being rendered unconsciousness.  As a matter of course, failure to comply with the

8

captors' orders resulted in severe beatings. North Korea again tried to coerce Crew Members into confessions that they were U.S. spies. The coercive techniques used at the Farm included putting a loaded gun to a Crew Member's head and threatening to kill him, or putting a gun to a Crew Member's head and pulling the trigger – only after the gun failed to fire would the hostage learn the gun was unloaded.

29. During the Crew Members' captivity, North Korea engaged in a protracted effort to coerce the United States into issuing an apology for the Pueblo's alleged intrusion into North Korea's territorial waters to spy. To this end, North Korea held at least two staged press conferences with their hostages. North Korea also coerced Crew Members into writing letters to their family members, falsely claiming that the North Korean government was treating them well and requesting that their families ask the United States to apologize. Some Crew Members were also forced to be in at least two propaganda films supportive of North Korea. After completing the films, these hostages feared that they had served their purpose and would be killed.

30. In December 1968, North Korea advised the Crew Members that the United States would be apologizing. The week before their release, however, North Korea dealt all of them a final and severe measure of punishment for an act of defiance. The Crew Members call that week "Hell Week." At one of the staged photo sessions for the press, some Crew Members gave a "middle finger" gesture in the photos to demonstrate to the world that North Korea's representations that they were being treated well and that they were caught spying for the United States, were false. Utterly humiliated after learning what the gesture meant, North Korea tortured all 82 surviving Crew Members for an entire week by making each one sit at a table at attention, while holding their chins to their chest and their hands on the table for several hours per day. If

anyone moved, that Crew Member was met with a severe blow to the head or face, or a swift hard kick to the ribs. Crew Members who were actually photographed using the "middle finger" gesture were brutally beaten. In the aftermath of Hell Week, North Korea left many Crew Members with debilitating physical and psychological injuries and scars that lasted for years or were permanent.

***North Korea Released the Pueblo's Crew after the United States Signed an Apology***

31.     After the United States reluctantly signed an apology falsely admitting that the Pueblo's crew was spying on North Korea, all 82 hostages were transferred to Panmunjom, North Korea, in anticipation of repatriation to U.S. custody on December 23, 1968. Before the repatriation, however, the Crew Members were threatened one last time: they were told that they had to cross a bridge (called the "Bridge of No Return") to safety in a single line, and if they did or said anything as they crossed the bridge, the hostages still waiting to cross would be shot and killed.

32.     In sum, during the Crew Members' nearly year-long captivity, North Korea's officials, employees, service members, and/or agents regularly subjected the Crew Members to physical and mental torture, including but not limited to savage beatings, threats of death, mock executions, sleep deprivation, food deprivation, forced holding of repeated and prolonged stress positions, and attempted brainwashing. Again, these acts were aimed at, *inter alia*, obtaining confessions for international propaganda purposes, and to coerce the United States into making a false public apology for spying on North Korea.

***North Korea Caused the Crew Members and Their Families to Suffer Severely***

33. The stress and trauma of those eleven months continued to torture the Crew Members and their families after the Crew Members were released.

34. Although all except one Crew Member survived with their lives, most suffered a whole host of problems after their release. Many, to this day, have suffered severe and permanent physical injuries; post-traumatic stress disorder and other ongoing mental health problems; night-terrors and flashbacks; and great pain and agony to their minds and bodies.

35. The immediate family members of the Crew Members also suffered greatly because of North Korea's actions. While North Korea held the Crew Members hostage and tortured them, their family members were left to wait helplessly for information about their loved ones' plight, often reduced to simply watching the crisis unfold on their television screens from thousands of miles away. These families experienced enormous stress from continual uncertainty and unrelenting terror and fear that their loved ones were dead, would be killed, tortured, disfigured, or otherwise harmed.

36. The family members suffered loss of economic support, emotional support, companionship, affection, and loving words from their Crew Member. Some family members had continuous nightmares about their Crew Member's torture and/or death. Many who suffered through the loss of their Crew Member for those eleven months simultaneously bore the burden of caring for or losing other close relatives during that same period. When their son, husband, father, or brother returned home after being released by North Korea, many family members suffered permanent, negative changes to the relationship they had enjoyed prior to the attack.

37.     At all times relevant to the events of this case, North Korea provided material resources and support to those individuals who carried out the acts complained of herein, including funding, training/know-how, and physical tools to carry-out heinous acts of torture.

38.     Accordingly, the Crew Member Plaintiffs seek a judgment from this Court (1) holding Defendant liable for the personal injuries they suffered as a result of their torture and abuse, including acts of assault, battery, false imprisonment, and intentional infliction of emotional distress, and (2) awarding them pain and suffering damages for those acts.

39.     The Family Member Plaintiffs seek a judgment from this Court (1) holding Defendant liable for the loss of solatium and intentional infliction of emotional distress that resulted from the hostage taking and torture of their Crew Member, and (2) awarding them solatium and/or pain and suffering damages.

**CLAIMS FOR RELIEF**

**COUNT I – ACTION FOR HOSTAGE TAKING AND TORTURE
ON BEHALF OF THE CREW MEMBER PLAINTIFFS**

40.     Plaintiffs repeat, reallege and incorporate by reference those facts and allegations set forth in all the forgoing paragraphs as if fully set forth herein.

41.     Defendant is liable to each Crew Member Plaintiff under FSIA § 1605A(c) for "hostage taking." FSIA § 1605A(h)(2) defines "hostage taking" as having "the meaning given that term in Article 1 of the International Convention Against the Taking of Hostages ("Hostage-Taking Convention")." U.N. General Assembly, *International Convention against the Taking of Hostages*, 17 November 1979, No. 21931, available at: https://www.refworld.org/docid/3ae6b3ad4.html (last accessed January 24, 2023). Article 1 of the Hostage-Taking Convention

defines a person who has committed the offence of "taking a hostage" as "any person who seizes or detains and threatens to kill, to injure or to continue to detain another person (hereinafter referred to as the "hostage") in order to compel a third party, namely, a State, an international intergovernmental organization, a natural or juridical person, or a group of persons, to do or abstain from doing any act as an explicit or implicit condition for the release of the hostage."

42. The Defendant, through its officials, employees, service members, and/or agents, detained the Crew Member Plaintiffs (the hostages) and repeatedly threatened to injure, kill, or continue to detain them unless and until the U.S. Government admitted to spying on Defendant and signed a Defendant-drafted public apology for such spying. Indeed, Defendant was named a state sponsor of terrorism based on an extensive record of hostage taking and severely injuring or killing its hostages, giving weight and credence to the repeated and numerous threats to kill or injure the Crew Members.

43. Defendant is liable to the Crew Member Plaintiffs under FSIA § 1605A(c) for "torture." FSIA § 1605A(h)(7) defines "torture" as having "the meaning given those terms in Section 3 of the Torture Victim Protection Act of 1991," 28 U.S.C. § 1350 ("TVPA"). Section 3 of the TVPA defines "torture" as "any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind."

44. Defendant, through its officials, employees, service members, and/or agents, committed such acts of torture of the Crew Member Plaintiffs by intentionally and repeatedly inflicting physical and psychological injuries and pain and suffering upon them at Defendant's detention centers. Defendant committed those act for the purpose of intimidating and extracting confessions and punishing the Crew Members for alleged spying.

45. As a direct and proximate result of Defendant's actions alleged herein and Defendant's material support of the actions of its officials, employees, service members, and/or agents, the Crew Member Plaintiffs endured pain and suffering during their captivity and for years and decades thereafter.

46. The Crew Member Plaintiffs therefore seek compensatory damages for their severe and lasting physical injuries, disfigurement, psychological harm, extreme pain and suffering, and mental anguish, in a baseline amount of $13.35 million – the same amount awarded to similarly-affected crew member plaintiffs in *Pueblo I* – with appropriate adjustments to account for the number of years each Crewmember Plaintiff lived after their release from captivity, and to take into account any substantial difference in the nature and severity of their injuries as compared with most of the Crew Member Plaintiffs.

**COUNT II – ACTION FOR ASSAULT AND BATTERY
ON BEHALF OF THE CREW MEMBER PLAINTIFFS**

47. Plaintiffs repeat, reallege and incorporate by reference those facts and allegations set forth in all the forgoing paragraphs as if fully set forth herein.

48. Defendant is liable to the Crew Member Plaintiffs for assault and battery under FSIA § 1605A(c), and state common law as described in the Restatement (Second) of Torts

§§ 21(assault), 13 (battery, harmful contact), and 18 (battery, offensive contact).

49. Defendant acted with the intention to cause harmful or offensive contact with the Crew Member Plaintiffs, or imminent apprehension of harmful or offensive contact, and did cause such contact, when, through its officials, employees, service members, and/or agents, it threatened to attack the Pueblo, fired upon the vessel, and boarded the vessel to capture it and its crew. It also acted with the requisite intention when it threatened to strike and/or struck Crew Member Plaintiffs while traveling to Defendant's detention centers, and throughout the 334 days of the Crew Member Plaintiffs' captivity.

50. As a direct and proximate result of Defendant's actions alleged herein, and Defendant's material support of the actions of its officials, employees, service members, and/or agents, the Crew Member Plaintiffs sustained severe and lasting physical injuries, disfigurement, psychological harm, extreme pain and suffering, and mental anguish during their captivity and for years and decades thereafter.

51. The Crew Member Plaintiffs therefore seek compensatory damages in a baseline amount of $13.35 million – the same amount awarded to similarly-affected crew member plaintiffs in *Pueblo I* – with appropriate adjustments to account for the number of years each Crewmember Plaintiff lived after their release from captivity, and to take into account the varying nature and severity of their injuries as compared with most of the Crew Member Plaintiffs.

## COUNT III – ACTION FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS ON BEHALF OF THE CREW MEMBER PLAINTIFFS

52. Plaintiffs repeat, reallege and incorporate by reference those facts and allegations set forth in all the forgoing paragraphs as if fully set forth herein.

53. Defendant is liable to the Crew Member Plaintiffs under FSIA § 1605A(c) and state common law, as described in the Restatement (Second) of Torts § 46(1), for intentional infliction of emotional distress.

54. Defendant's conduct alleged herein, through its officials, employees, service members, and/or agents, was extreme and outrageous and it intentionally or recklessly caused severe emotional distress to each Crew Member.

55. As a direct and proximate result of Defendant's actions alleged herein and Defendant's material support of the actions of its officials, employees, service members, and/or agents, the Crew Member Plaintiffs endured pain and suffering during their captivity and for years and decades thereafter.

56. The Crew Member Plaintiffs, therefore seek compensatory damages for the injuries they suffered, including but not limited to their pain, suffering, and mental anguish, in a baseline amount of $13.35 million – the same amount awarded to similarly-affected crew member plaintiffs in *Pueblo I* – with appropriate adjustments to account for the number of years each Crewmember Plaintiff lived after their release from captivity, and to take into account any substantial difference in the nature and severity of their injuries as compared with most of the Crew Member Plaintiffs.

## COUNT IV – ACTION FOR FALSE IMPRISONMENT
## ON BEHALF OF THE CREW MEMBER PLAINTIFFS

57. The Crew Member Plaintiffs repeat, reallege and incorporate by reference those facts and allegations set forth in all the forgoing paragraphs as if fully set forth herein.

58. Defendant is liable to the Crew Member Plaintiffs under state common law, as described in the Restatement (Second) of Torts § 35, for false imprisonment.

59. Defendant, through its officials, employees, service members, and/or agents, acted with the intention to confine each Crewmember Plaintiff on the seized vessel when it captured the Pueblo, forced each Crewmember Plaintiff onto buses and trains to be transported to Defendant's detention centers, and held each Crewmember Plaintiff at its detention centers. Defendant's conduct resulted in the false imprisonment of each Crewmember Plaintiff for 334 days.

60. As a direct and proximate result of Defendant's actions alleged herein and Defendant's material support of the actions of its officials, employees, service members, and/or agents, the Crew Member Plaintiffs endured pain and suffering during their captivity and for years and decades thereafter.

61. The Crew Member Plaintiffs therefore seek compensatory damages for the injuries they suffered, including but not limited to their pain, suffering, and mental anguish, in a baseline amount of $13.35 million – the same baseline amount awarded to similarly-affected crew member plaintiffs in *Pueblo I* – with appropriate adjustments to account for the number of years each Crewmember Plaintiff lived after their release from captivity, and to take into account any substantial difference in the nature and severity of their injuries as compared with most of the Crew Member Plaintiffs.

## COUNT V – ACTION FOR SOLATIUM AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS ON BEHALF OF THE FAMILY MEMBER PLAINTIFFS

62. The Family Member Plaintiffs repeat, reallege and incorporate by reference those facts and allegations set forth in all the forgoing paragraphs as if fully set forth herein.

63. Defendant is liable to the U.S.-citizen Family Member Plaintiffs for "loss of solatium" under FSIA § 1605A(c) and state common law as described in the Restatement (Second) of Torts § 46(2)(a).  Under the FSIA, a "solatium claim is indistinguishable from an IIED claim" and is therefore analyzed by applying the standards for intentional infliction of emotional distress ("IIED").[4]

64. Defendant is liable to the foreign-citizen Family Member Plaintiffs for intentional infliction of emotional distress and loss of solatium under the law of the District of Columbia. The District of Columbia follows the Restatement (Second) of Torts § 46(2)(a) for the applicable IIED claim.

65. Defendant, through its officials, employees, service members, and/or agents, intentionally or recklessly caused severe emotional distress to each Family Member Plaintiff at the time of Defendant's capture of the Pueblo and its crew and its subsequent detention of each Family Member Plaintiff's respective Crew Member.  Defendant's extreme and outrageous abuse and mistreatment of the Crew Members was intended, or may be deemed to have been intended, to cause severe emotional harm to each Family Member Plaintiff.  Moreover, Defendant's hostage taking and torture of the Crew Members are by their very definition extreme

---

[4] "Under the FSIA, a 'solatium claim is indistinguishable from an IIED claim.'" Worley v. Islamic Republic of Iran, 75 F. Supp. 3d 311, 336 (D.D.C. 2014) (Lamberth, J.) (quoting *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 79 (D.D.C. 2010) (Lamberth, J.)).

and outrageous and are intended by terrorists to cause the highest degree of emotional distress in their victims, including immediate family members of victims.

66. As a direct and proximate result of Defendant's conduct alleged herein and Defendant's material support of the actions of its officials, employees, service members, and/or agents, each Family Member Plaintiff endured pain and suffering during their Crew Member's captivity and for years and decades thereafter.

67. The Family Member Plaintiffs therefore seek compensatory damages for the emotional injuries they suffered, in a baseline amount of $4 million for a spouse, $2.5 million for a parent or child, and $1.25 million for a sibling – the same amounts awarded to similarly-affected family member plaintiffs in *Pueblo I* with the same familial relationship to a crew member – with appropriate adjustments to account for any substantial difference in the nature and severity of their pain and suffering as compared with most of the Family Member Plaintiffs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for the following relief:

68. A speedy and final resolution of the claims of these victims of state-sponsored terrorism, many of whom are of an advanced age;

69. A Judgment holding Defendant liable for the acts complained of herein; and

70. A Judgment against Defendant for money damages to compensate Plaintiffs for their severe and lasting physical injuries, disfigurement, psychological harm, and extreme mental anguish, including but not limited to pain and suffering and solatium damages, in an amount to

be determined based on evidence to be adduced in accordance with a schedule to be set by the Court and in accordance with the relief granted in *Pueblo I*.

DATED: January 31, 2023                    Respectfully submitted,

By:  */s/* Mark. N. Bravin
  Mark N. Bravin (D.C. Bar No. 249433)
  J. Matthew Williams (D.C. Bar No. 501860)
  MITCHELL SILBERBERG & KNUPP LLP
  1818 N Street NW, 7th Floor
  Washington DC, 20036
  (202) 355-7900 (Telephone)
  (202) 355-7886 (Facsimile)
  mnb@msk.com
  mxw@msk.com

  *Attorneys for Plaintiffs*