```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLUMBIA
 2                            ---

 3
     JOHN AND JANE DOES,           )
 4                                 )
                                   )
 5        Plaintiffs,              )  CIVIL NO. 23-0273
                                   )
 6   v.                            )
                                   )  October 16, 2025
 7   DEMOCRATIC PEOPLE'S REPUBLIC  )
     OF KOREA,                     )
 8                                 )
                                   )
 9        Defendant.               )
     _____)
10

11           TRANSCRIPT OF REMOTE STATUS CONFERENCE

12           BEFORE THE HONORABLE TIMOTHY J. KELLY
                UNITED STATES DISTRICT JUDGE
13
                              ---
14

15   APPEARANCES:      MITCHELL SILBERBERG & KNUPP LLP
                        BY:  MARK BRAVIN
16                           ALBINA GASANBEKOVA
                        1818 N Street, NW, 7th Floor
17                      Washington, DC 20036

18                      For the Plaintiffs

19

20

21                            ---

22   COURT REPORTER:   CHANDRA R. KEAN, RMR
                        Official Court Reporter
23                      333 Constitution Avenue, NW
                        Washington, DC 20001
24

25
```

1          **PROCEEDINGS**

2          (Court called to order at 10:07 a.m.)

3          DEPUTY COURTROOM CLERK:  We're on the record in

4     civil matter 23-0273, John and Jane Does v. Democratic

5     People's Republic of Korea.

6          Present for the plaintiffs are Mark Bravin and

7     Albina Gasanbekova.

8          THE COURT:  All right.  Well, good morning to

9     both of you.  I'm sure it was frustrating for you all to

10    get -- to read the minute order I entered at the end of

11    last month.  It was frustrating for me because I was in

12    the middle of doing a lot of work to try to resolve your

13    outstanding motion.

14         And I thought it made sense for us to sort of

15    huddle up after I came to the -- after I sort of began

16    to have those concerns because I think it seems to me we

17    can -- there are two possibilities where we move from

18    here.  Maybe you'll offer a third, but, number one, you

19    could renew efforts -- and as I'm saying this, I guess

20    these aren't even mutually exclusive, but you could

21    renew efforts to try to effect service under 1608 in

22    some way.  Or you could -- and/or you could file

23    something, a brief in this case, to try to convince me

24    that -- or, you know, really in a way re-convince me,

25    but try to convince me that what you have done does in

1    fact satisfy the statute -- or at least is permissible,

2    let's put it more broadly.

3        I do think as I kind of started to peel through

4    this part of it, I guess I won't spend much time saying

5    more than what was in the minute order, but I think for

6    a variety of reasons, including my reliance on some

7    cases that upon further and closer inspection, for one

8    reason or another, didn't really support the proposition

9    that the service, as I had authorized it, met the

10   statute.  It just seemed to me the best thing to do

11   would be to huddle up with you all and see how you all

12   wanted to proceed.  And, you know, I'll note, and I'm

13   sure -- I know you all know this but, you know, at least

14   part -- number one, I have to make sure that whatever

15   happens here, however you end up effectuating service is

16   lawful, number one, just at a high level of, you

17   know -- because that's my job.  But number two is, of

18   course, down the road, just as a practical matter, I

19   want to do something that if indeed the defendant

20   country ever enters its appearance and moves to try to

21   challenge this, I don't want to send you back to square

22   one.

23       So there's both a, you know -- again, I obviously

24   have to make sure that service is effectuated properly

25   under the law just as part of my job, but I think

1    there's also a practical reason to kind of -- for me to

2    have paused things and just check in with you to see how

3    you all think I should go from here.

4        So Mr. Bravin, with that, I'll hear from you about

5    where you think we should go.

6        MR. BRAVIN:  Thank you, Your Honor, and good

7    morning.

8        We have been thinking hard about this since we got

9    your minute order, and came out exactly the same way you

10   just described.

11       In the declaration I submitted in support of our

12   motion for alternative service, we counted all of the

13   things that we did, starting even before we filed the

14   lawsuit, to try to get clarity on how we were going to

15   effect service, and we didn't find a way.

16       The last word to us was from the State Department

17   in October 2023 saying, "We're working on it.  We'll get

18   back to you if we come up with something."  And they

19   never got back to us.

20       So we didn't know to check that in -- we had

21   another case that's not -- that we didn't rely on

22   because it hadn't gotten that far, but it's *Butler v.*

23   *The Democratic People's Republic*.

24       The State Department served a diplomatic note and

25   sent the diplomatic note and a letter to the Clerk of

1    the Court saying:  This is what we did.  This is what we

2    put in the note, and here is the note.  That case is

3    awaiting a final decision on a motion for default

4    judgment.  And so --

5              THE COURT:  Who's the judge in that case, if

6    you know?

7              MR. BRAVIN:  I did know, but I don't in this

8    moment.

9         Do you know?

10             MS. GASANBEKOVA:  Judge Ana Reyes.

11             THE COURT:  Okay.

12             MR. BRAVIN:  So I really want to wait for Judge

13   Reyes to finish because we don't know what else is going

14   on in that case.  For example, in *Bae*, one of the two

15   cases that we rely on, it turned out they didn't comply

16   with the substantive requirements of a cause of action,

17   and the case was dismissed, not because of failure of

18   process --

19             THE COURT:  The judge just never got to it.

20             MR. BRAVIN:  Correct.

21        And so I've been trying to reach the gentleman at

22   the State Department, Jared Hess, who for some years now

23   has been the point person for these requests and who I

24   communicated with.  But because of the government

25   shutdown, I got an email from him at 2:00 in the morning

1    saying because of the shutdown I'm furloughed.  And

2    that's it.

3         So hopefully the government will be back in

4    business soon, and we will renew that effort, because it

5    was successful in *Butler*.  We'll renew that effort,

6    we'll send -- in fact, we don't even have to wait for

7    the government to reopen.  Your deputy clerk just

8    confirmed that the Clerk of the Court is open, so we can

9    initiate the request with all our copies of documents

10   and a check asking her to transmit them to the State

11   Department.  And then when they reopen, we'll follow up

12   with Mr. Hess and see what we can do to expedite

13   things.

14        In the *Butler* case the timing was peculiar because

15   we were told in October "we haven't come up with

16   anything, we'll get back to you."  And then in November,

17   they commenced the process of service by diplomatic

18   note.  They could have told us and then we would have

19   saved all of us a lot of trouble, but they didn't.

20        So I think that's the next step, is for us to

21   initiate -- renew that effort to effect service to

22   1608(a)(4).

23             THE COURT:  Remind me, the diplomatic note is

24   which provision?

25             MR. BRAVIN:  So there is more to the process

1    than is listed in (a)(4).

2            THE COURT:  Right.

3            MR. BRAVIN:  But when the Secretary of State

4    gets a request from the Court to serve documents, they

5    have a process.

6            THE COURT:  I see.

7            MR. BRAVIN:  And in every other country,

8    including, for example, Iran, we, the United States,

9    have a treaty with a third country access Protecting

10   Power, and they effect service for us.  The Protecting

11   Power for North Korea has a treaty that says they do not

12   effect service.

13       One of the suggestions -- I was trying to come up

14   with ideas.  I suggested that maybe you could amend that

15   treaty or you could go through another country that has

16   a treaty.  But what they finally came up with apparently

17   worked.  And in the diplomatic note, which I'm looking

18   at right now --

19           THE COURT:  Just really the question I just

20   meant to ask, and I see now, the diplomatic note is

21   through (a)(4), essentially.

22           MR. BRAVIN:  That's right.  That's how the

23   State Department communicates for states.

24           THE COURT:  And for some reason, like this

25   other case you mentioned -- so there was a period -- I

1    take it from both the way you all proceeded and the way

2    the plaintiffs proceeded in the two other cases that

3    we've been talking about, that you had cited, the case

4    before Judge --

5             MR. BRAVIN:  Kollar-Kotelly.

6             THE COURT:  -- Kollar-Kotelly, the case

7    before -- the other case I'm blanking on.

8        Judge Sullivan.  Judge Sullivan.

9        So there was a period of time where, for whatever

10   reason, plaintiffs were being told service through

11   diplomatic note is not possible, is not available.

12            MR. BRAVIN:  Not currently, yeah.

13            THE COURT:  Not currently.

14            MR. BRAVIN:  Right.

15            THE COURT:  And then sometime after that in

16   this other case, it seems like it's possible again.  Is

17   that -- I mean, at a high level of generality, is that

18   what you're sort of -- that's what you think?

19            MR. BRAVIN:  Well, that's what I know

20   because --

21            THE COURT:  Okay.  That's what you know.

22       Yeah, okay.

23            MR. BRAVIN:  And so because we didn't know, the

24   right thing is to try again.

25            THE COURT:  Yes.

1          MR. BRAVIN:  Hopefully, nothing has changed --

2          THE COURT:  Right.

3          MR. BRAVIN:  -- and they'll just do it.

4     In *Butler*, it took five months from the initiation

5     of the diplomatic request from the Court to the State

6     Department until the State Department submitted the note

7     to the Court saying, this is what we told them, and this

8     is -- this satisfies 1608(a)(4).

9     So hopefully that will work.  And hopefully, it

10    won't be a super long delay, since they now know how to

11    do it, but we won't know until they get back into the

12    office.

13         THE COURT:  Okay.

14         MR. BRAVIN:  As to the second alternative, if

15    it's okay, I would like to spend a few minutes just

16    explaining why our case is really unique.

17    So you mentioned in your minute order *Barot v.*

18    *Zambia*, and that relied on a D.C. Circuit case about the

19    Bolivian Air Force.  Well, *Barot* is like other cases

20    where the plaintiff just didn't address their mailing in

21    the right way.  And the Court initially ordered the

22    plaintiff to serve the Embassy of Zambia in Washington,

23    and that's what the plaintiff did.

24    But then Zambia came in and said, dismiss this case

25    because service on the Embassy is not permitted.  And

1    so -- then the Court said:  Plaintiff, serve by mail and

2    send it to -- address it to the head of the Ministry of

3    Foreign Affairs and send it to the address in Zambia.

4    And for whatever reason, they addressed the

5    envelope -- they sent it by DHL to Zambia but -- and

6    they sent it to the P.O. Box of the Ministry of Foreign

7    Affairs, but the addressee was Embassy of Zambia.

8        And, of course, there's no embassy in the home

9    country, so -- and nevertheless, the Ministry of Foreign

10   Affairs received it, signed for it, and acknowledged

11   that it had been received, but they came back to the

12   Court and they said plaintiff did not follow the mailing

13   rule.

14       And then finally, the plaintiff did it right, and

15   in a subsequent proceeding failed to satisfy the Court

16   on the substantive cause of action, and the case was

17   dismissed.

18       There's another case where --

19           THE COURT:  Mr. Bravin, let me just stop you

20   there.  So tell me, you just laid out what happened in

21   that *Barot* case.

22           MR. BRAVIN:  Right.

23           THE COURT:  Tell me why that matters.

24       In other words, is your argument to me that this is

25   about -- I mean, it is at a high -- the case at a high

1　　level of generality is about, you know -- I'm just

2　　finding -- I'm looking at my minute order now, you know,

3　　"strict adherence to 1608 is required."

4　　　　So it's about, within the prongs of 1608, following

5　　the statute exactly and not deviating from it, strictly

6　　adhering to it.

7　　　　　　THE COURT:  Right.

8　　　　　　THE COURT:  But that it says nothing one way or

9　　the other about whether alternate service could be

10　　available.

11　　　　　　MR. BRAVIN:  That's correct.

12　　　　　　THE COURT:  Okay.  I mean, that is the

13　　argument, if I were in your shoes, I would be making.

14　　I'm not sure -- I haven't looked at it closely, but the

15　　point is, it doesn't close the door to alternate

16　　service.  It simply says that as far as the statute that

17　　exists goes, you have to comply with it strictly.

18　　　　　　MR. BRAVIN:  Right.  And in every case where

19　　service was held to be improper under 1608 -- on

20　　1608(a), under the foreign sovereign --

21　　　　　　THE COURT:  Right.

22　　　　　　MR. BRAVIN:  -- because a process existed but

23　　the plaintiff or the plaintiff's counsel didn't follow

24　　it.  And at the time that we filed our motion for

25　　alternative service with the Court, there was no

1      possible method.  It's not like we ignored the steps.

2                THE COURT:  Right.

3                MR. BRAVIN:  So that's one distinction.  And

4      there are appeal cases like that; for example, one went

5      all the way to the Supreme Court where counsel served

6      their papers on the Embassy of Syria.  And the Court

7      said you're suppose to address this to the head of the

8      Ministry of Foreign Affairs.  You didn't explain why you

9      didn't do that, and you didn't explain why you didn't go

10     to the State Department and ask them to serve it.

11             So here's where our case is different from all of

12     them:

13             First of all, at the time that the Court -- that

14     Your Honor issued the minute order authorizing

15     alternative service, there was no possible way of

16     satisfying any of the four options in the statute.

17     That's one.

18             Two, North Korea was already on notice of the same

19     complaining allegations in *Pueblo I*.  And in *Pueblo I*,

20     if -- instead of closing out the case we had held it

21     open and added more plaintiffs, we would not have had to

22     serve North Korea a second time, because it's not a

23     material change in the cause of action.

24             North Korea did not respond in *Pueblo I*, and as we

25     put in our papers, they have not responded in any case

1    where they've been served.

2        Our case is the first one where we've presented the

3    Court with a request for alternative service -- well,

4    actually in -- I don't know if in *Crespo* they went to

5    the State Department or if they didn't.  But in any

6    case, we did deal with the State Department, and we have

7    this additional factor that North Korea was already on

8    notice of all of the allegations of the

9    complaint -- substantive allegations, because it was the

10   same violations of international law, torture, et

11   cetera.  There is no case that's dealt with --

12            THE COURT:  Right.

13            MR. BRAVIN:  -- these circumstances.  And we

14   pointed out in the motion that when Congress passed the

15   terrorism statute, the state sponsors of terrorism

16   statute, they made it very clear that courts should

17   liberally apply substantive rules because the purpose of

18   the statute was to give relief to as many of the victims

19   as possible.

20       Apparently, having looked for any shred of

21   legislative history, nobody thought about the

22   circumstance where the state sponsor of terrorism, a

23   target of that statute intended to give benefits to the

24   victims, what would happen if it was not possible to

25   serve.  And that opens the door for the Court to say,

1     okay, the statute doesn't say what you do in a

2     circumstance like this.  There are some factors here

3     that indicate that North Korea already knew about all of

4     the substantive allegations, and they defaulted in

5     *Pueblo I.*

6          There was another one I was going to mention.  Let

7     me pause for one second.

8          Oh, yes.  So if the Court -- if we don't get

9     service on a renewed effort through the State Department

10    and we need to file the brief, and in fact maybe the

11    right thing to do is for us to file the brief while

12    we're waiting to find out if they did, but hold that for

13    a moment.  I think one further kind of due process

14    argument is that the final default judgment also needs

15    to be served.  And if the State Department has some

16    problems with serving the complaint and summons, now

17    maybe that problem will go away.

18         We are not the only case waiting for the State

19    Department to serve.  And I spoke with counsel in one of

20    those cases arising out of the Hamas massacre in Israel

21    in October of 2022, and he said we did the process, went

22    through the Court, they delivered the check and

23    everything to the State Department, and we haven't heard

24    anything, and there's no one to call right now.  So they

25    are kind of in limbo on that.  But if by the time we

1    effect service of the final default judgment, at some

2    point, somehow, it's also possible that DHL will resume

3    deliveries, and we can try that method.  They'll

4    have -- whenever it is, they'll have 60 days to come

5    back and reopen and make their sovereign immunity

6    arguments, and they will not have waived any rights.

7         So that's a further due process protection.  And

8    maybe due process isn't quite the right word, but it

9    fits the spirit of giving sovereigns notice.  And I

10   think the right thing to do is not to try to convince

11   you to go that route just yet but go to the State

12   Department and see what happens.

13        THE COURT:  I think you're right about that,

14   just -- well, especially given the information you now

15   have about this other case, that seems right to me.

16        Hearing -- I will look at -- I will certainly

17   maintain an open mind about it and look at whatever you

18   file whenever you file it, and I've heard what your

19   arguments are now.  I think in some ways a lot of them

20   converge on the idea of -- like your first argument was,

21   Judge, no process -- you know, there was no process at

22   that time.  And that's -- in a lot of different contexts

23   that argument is made to judges, sort of a, "What else

24   are we supposed to do, Judge," you know, or, "There is

25   no other way for our client to get relief," whether it's

1    a substantive question, whether it's a question like

2    this in terms of process.  And, unfortunately, sometimes

3    the answer is that if it can't be done lawfully, it

4    can't be done, and there's not a form of relief for

5    every situation, or there's some times when someone who

6    has been wronged can't get relief, for whatever reason

7    it might be.

8         So the fact that no process existed -- again,

9    though, this is a unique situation or a rare situation

10   where, you know, Congress has said, as you mentioned,

11   you know, there have to be liberal and flexible

12   application of substantive rules.  Why wouldn't the same

13   thing -- especially when it's clear, if it's clear, that

14   a party is evading service, doing all they can to not

15   accept service, why shouldn't that apply in terms of

16   service as well.

17        So look, I'll -- and you've mentioned the

18   limitations of the *Barot* case.  So bottom line is, I

19   think you've cracked the door open with me a little bit,

20   and I understand where your arguments would go.  How it

21   would come out, I don't know.  But I think you're right

22   that in the first instance, especially given the

23   information you now have, the best thing to do is to go

24   back and see how that plays out.

25        So I guess -- I think that makes sense.  You could

1    file something now on this -- with these arguments, but

2    the truth is I think I'm probably not going to focus in

3    on it until you come back to me and say, Judge, we've

4    been -- one way or the other, we don't think we'll be

5    able to get the "A" for service here, and then we turn

6    to these alternate arguments.

7        So i think the question is -- and let me also say,

8    about dealing with our Clerk's Office, I think at some

9    point -- I keep thinking the shutdown is going to end

10    any moment, and then it doesn't.  It's gone on longer

11    than I thought at the beginning.  I'll just say that,

12    you know, if it goes on a number -- if it goes on into

13    next week or the week after, at some point the Judiciary

14    will, I think, like other entities trying to survive on

15    fumes, we'll cut back doing -- being able to do certain

16    things.  Already that's happening to some degree.  I

17    would assume it will happen with our Clerk's Office.

18        And so this is a long-winded way of saying even

19    though they are providing the service you indicated,

20    they may be open to do that now, that doesn't mean

21    they'll be open to do that in a week or two.  So I guess

22    I would say is, you know, go ahead and move forward with

23    that quickly.  And I don't know.  Maybe we set a date

24    for you to just file a status report and let me know

25    what's going on, and then we sort of take it from there.

1    Again, I got far enough into your case, just so you

2    know, that once we -- if we resolve the service issue

3    successfully, I don't think it will take me very long to

4    turn around an opinion, but we are where we are.

5        So I don't know what you think the appropriate

6    amount of time would be.  I don't know, Mr. Bravin.

7    What's your suggestion about how long I should require

8    you to file an update, you know, a status report letting

9    me know where things stand, when you might have reason

10   to kind of know how things are playing out?

11           MR. BRAVIN:  Since we're all dealing with

12   basically the same landscape, and we definitely want to

13   do this in time for the Court to transmit the papers to

14   the State Department, we're going to move on that right

15   away.

16           THE COURT:  Yeah.

17           MR. BRAVIN:  Why don't we say, like, 30 days,

18   and if, heaven forbid, the government is still closed at

19   that point, then we can talk about what to do.

20           THE COURT:  Okay.

21           MR. BRAVIN:  One other thing I wanted to

22   mention.  This isn't the only kind of issue that has

23   come up under the FSIA where there was no guidance -- no

24   real guidance at the time.

25       In 2002, the D.C. Circuit decided that foreign

1    sovereigns are not entitled to minimum contacts due

2    process protection because they are not persons, and

3    that was in the *Prince* case.  And the Court had to

4    figure it out.  There was no -- no guidance really.  I

5    mean, that issue has just recently come back because the

6    Ninth Circuit reached the same conclusion, and the

7    parties in that case, the defendants, took it to the

8    Supreme Court, and I guess we're waiting for a decision

9    on whether sovereigns get minimum context due process.

10        But the point is at that juncture, the Court had to

11    make a decision because if they held that they were

12    entitled to minimum context protection the case would

13    have been over.  And so they had to take all of the

14    factors into consideration and come up with a solution

15    that best fit the law.  And it turned out it was the

16    right decision.

17        Our case is not going to have the ramifications

18    because there are no other state sponsors of terrorism

19    that DHL won't deliver to and -- or that we don't have

20    diplomatic relations with or that we don't have a

21    Protecting Power treaty with -- so that another country

22    can do it.

23        So we may have to ask the Court to apply all of

24    these concerns, including the one you mentioned a few

25    minutes ago.  I forgot that North Korea refused to

1    accept the package, which we had no control over.  In

2    another case, and I don't remember which one, they did

3    accept the package.  And it is what it is, and we'll

4    just work with the facts and circumstances.  We'll do

5    our best, and hopefully, you won't have to make that

6    hard choice, but you might, or at least we might ask you

7    to.

8          THE COURT:  Right.  Okay.  Okay.

9        So, you know -- and you will decide whether you

10   think because of the way this statute works it makes

11   sense as part of revisiting four, whether you think you

12   have to revisit three, and just confirm again that in

13   fact DHL doesn't -- or any -- there are no private, you

14   know, entities that will deliver with a signed -- you

15   know, mail with a signed receipt to North Korea.

16        So let's say -- we'll say 30 days.  30 days will

17   bring us, let's just say before -- it's just an extra

18   week.  Let's just say I'll make it right before

19   Thanksgiving, the deadline.  So let's say November 25th,

20   which is the Tuesday -- it's just an extra week, so it's

21   really like five weeks -- two days before Thanksgiving,

22   if you'd file a status report that just lets me know

23   where things stand and how you, going forward, are

24   anticipating proceeding, and we'll go from there.

25         MR. BRAVIN:  Okay.  That's good.

1          So the minute order on this will just say status

2    report no later than --

3          THE COURT:  Yeah.  I'll just -- say I ask for a

4    status report, you know, regarding -- status report

5    regarding service issues by 11/25.  And, you know, you

6    can let me know what has happened, and how you all want

7    to proceed if there's -- if you're still going down the

8    "(a)(4)" road, you can just let me know.  And I will

9    just say, if there is still the possibility that that's

10   something you're pursuing, it may be, you know, Judge,

11   we propose to file another status report in 60 days

12   because we think there's going to be something to tell

13   you on that front, in that period of time, whatever it

14   might be.  Or, Judge, no, we've given that up.  We

15   propose to file a brief on this issue in 30 days, or

16   whatever it might be.  Let me know what you think the

17   next deadline should be, and then we'll just go from

18   there.

19          MR. BRAVIN:  And if it turns out -- I mean, one

20   of the points you made in the minute order was that

21   *Crespo* and *Bae* had not reached a final judgment, but if

22   in *Butler* the Court issues a final judgment, that might

23   be another reason to --

24          THE COURT:  Yeah, although *Butler*, you said,

25   was one where they were able to do it.

1          MR. BRAVIN:  They were able to do it, yeah.

2          THE COURT:  In a sense, it's only -- you know,

3     I don't know how that plays into the facts.  You know,

4     to the extent -- you began by saying, you know -- your

5     first argument was no process existed.  In a sense, if

6     that -- there's really no reason to think that Judge

7     Reyes will not accept that because that's -- that

8     complies with the statute.

9          So in a sense, it will affirm in some sense that a

10    process does exist, but maybe just for some random

11    reason they wouldn't, I don't know -- the person on duty

12    that day wouldn't accept your package, or who knows.

13         So I don't know.  In a way, yes -- I mean, look, I

14    think any of these things are, I think, data points that

15    I should be considering here.  I think if Judge -- if

16    that is truly -- the Judge Reyes' case, if that does

17    play out in a positive way for the plaintiff,

18    then -- but I would say even if it -- I mean, again,

19    regardless of her ruling, it -- that plaintiff was able

20    to effectuate service, it appears, under the statute.

21    And in a way, you know, you could argue that that cuts

22    against me making -- doing -- me finding that alternate

23    service is appropriate here, because at least in some

24    case, it's -- that system still is working.

25         Now, it didn't work, as you say, for those other

1      plaintiffs in those other cases, so -- the other cases

2      that you had cited and the *Bae* case, and so who knows.

3      But I think we can all agree that on the state of

4      affairs as we know it, redoubling your efforts on that

5      front probably is the thing to do to make sense -- is

6      the thing that it makes sense to do in the first

7      instance, and we'll just see what happens.

8              MR. BRAVIN:  Thank you, Your Honor.  Agreed.

9              THE COURT:  Okay.  So --

10             MR. BRAVIN:  One question before we finish.

11             THE COURT:  Sure.  Yes.

12             MR. BRAVIN:  You mentioned you didn't think it

13     would take you long once we get service figured out to

14     get through to a final decision on the motion for

15     default judgment.

16         So, am I -- is it fair to say that at least so far

17     no questions have come up?  Or you may have some

18     questions but you don't want to discuss them with us

19     just yet because we have this service issue?

20             THE COURT:  I haven't had anything that I think

21     we'll have to chat about yet.

22             MR. BRAVIN:  Good.  Thank you.

23             THE COURT:  All right.  So I'll look for that

24     report right before Thanksgiving, and we'll go from

25     there.

1            MR. BRAVIN:  And I'll note that this painting

2    behind me is the attack on the *USS Pueblo* by the North

3    Korean Forces.

4            THE COURT:  There it is.  Very appropriate.

5    I'm glad you pointed that out.

6        I'll look for that report, and we'll go from

7    there.

8            You all are dismissed.  Thank you.

9            (Court in recess, 10:44 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF COURT REPORTER

2

3          I, CHANDRA KEAN, RMR, do hereby certify that the

4     above and foregoing constitutes a true and complete

5     transcript of the proceedings held in the above-titled

6     matter.

7          Dated this 20th day of October, 2025.

8

9

10     _____
                    Chandra Kean, RMR
11                   Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25